**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

IMAGE PROCESSING TECHNOLOGIES, LLC,

Plaintiff,

v.

LG ELECTRONICS INC., and
LG ELECTRONICS USA, INC.,

Defendants.

CASE NO. 2:22-CV-00077-JRG-RSP

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....................................................................................................1

II. TECHNICAL AND PATENT BACKGROUND.............................................................1

III. ARGUMENT FOR DISPUTED TERMS ..................................................................5

A. "the histogram calculation units being configured to form a histogram representative of the parameter" ........................................................................ 5

1. The Court Should Not Follow The PTAB's Incorrect And Unchallenged Construction ...................................................................................... 5

2. The Claim Language Does Not Support IPT's Proposal Because "the parameter" Finds Antecedent Basis In "at least one parameter," Which Is Not Singular ........................................................................................ 7

3. The Specification's Embodiments Disclose Histogram Calculation Units, Each Processing A Different Parameter ............................................ 9

B. "histogram" ........................................................................................ 14

C. "wherein the validation signal is produced from time coincidences signals from the time coincidence bus so that the calculation of the histogram depends on the classification signals carried by the time coincidence bus"................................. 18

IV. CONCLUSION........................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*01 Communique Lab., Inc. v. LogMeIn, Inc.*,
687 F.3d 1292 (Fed. Cir. 2012) .......... 8

*AGIS Software Development LLC v. Google LLC*,
No. 2:19-CV-361-JRG, 2020 WL 7229753 (E.D. Tex. Dec. 8, 2020) .......... 6

*Apple Inc. v. Wi-Lan Inc.*,
25 F.4th 960 (Fed. Cir. 2022) .......... 13

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
512 F.3d 1338 (Fed. Cir. 2008) .......... 8, 9

*Effective Exploration, LLC v. Classic Operating Co., LLC*,
No. 2:14–cv–00869–JRG–RSP, 2015 WL 5012139 (E.D. Tex. Aug. 21, 2015) .......... 13

*Image Processing Technologies, LLC v. Samsung Elecs. Co.,*
No. 2:16-cv-00505-JRG, 2017 WL 2672616 (E.D. Tex. June 21, 2017) .......... 1

*KCJ Corp. v. Kinetic Concepts, Inc.*,
223 F.3d 1351 (Fed. Cir. 2000) .......... 8

*Seagen Inc. v. Daiichi Sankyo Co.*,
No. 2:20-CV-00337-JRG, 2021 WL 4168660 (E.D. Tex. Sept. 14, 2021) .......... 13

*SynQor, Inc. v. Artesyn Techs., Inc.*,
709 F.3d 1365 (Fed. Cir. 2013) .......... 9

*Transocean Offshore Deepwater Drilling, Inc. v. Pacific Drilling, Inc.*,
No. H–13–1088, 2015 WL 3422410 (S.D. Tex. May 27, 2015) .......... 9

*United Services Automobile Association v. PNC Bank N.A.*,
Nos. 2:20-CV-00319-JRG, 2021 WL 5451020 (E.D. Tex. Nov. 22, 2021) .......... 6

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) .......... 19

# TABLE OF EXHIBITS

| **Ex. Number** | **Document** |
|---|---|
| Plaintiff's Exhibits Filed With Plaintiff's Opening Brief (Dkt. 53) | |
| A (Dkt. 53-1) | U.S. Patent No. 6,959,293 ("the '293 Patent") |
| B (Dkt. 53-2) | U.S. Patent No. 8,989,445 ("the '445 Patent") |
| C (Dkt. 53-3) | THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS 793 (7th ed. 2000) |
| D (Dkt. 53-4) | OXFORD DICTIONARY OF ENGLISH 1277 (2d ed. 2003) |
| E (Dkt. 53-5) | Final Written Decision, *Samsung Elecs. Co. v. Image Processing Technologies LLC*, No. IPR2017-00336, Paper No. 38 (P.T.A.B. May 9, 2018) |
| Defendants' Additional Exhibits Filed With This Brief | |
| 1 | Random House Unabridged Dictionary Second Edition, by Random House Inc. (1997) |
| 2 | An Introduction to Statistical Methods and Data Analysis Second Edition, by Lyman Ott (1984). |
| 3 | Teach Yourself Statistics, by Alan Graham (1994). |
| 4 | Webster's II New College Dictionary, by Houghton Mifflin Company (2001) |
| 5 | Final Written Decision, *Google LLC v. AGIS Software Development, LLC*, Paper 34, No. IPR2018-01079 (P.T.A.B. Nov. 19, 2019) |
| 6 | Patent Owner Image Processing Technologies, LLC's Preliminary Response, *Samsung Elecs. Co. v. Image Processing Technologies, LLC*, No. IPR2017-00336 (P.T.A.B. Mar. 15, 2017) |
| 7 | Declaration of Dr. Robert Stevenson Submitted In Support Of Samsung's Responsive Claim Construction Brief, Dkt. 138-7 in *Image Processing Technologies, LLC v. Samsung Electronics Co. Ltd.*, No. 2:16-CV-0505-JRG (E.D. Tex.) |
| 8 | LG's Petition For *Inter Partes* Review, *LG Elecs. v. Image Processing Technologies, LLC*, No. IPR2023-00104 (P.T.A.B. Oct. 25, 2022) |

# I. INTRODUCTION

Defendants LG Electronics Inc. and LG Electronics USA, Inc. (collectively, "LG") hereby submit their responsive claim construction brief, addressing three terms in the sole patent claim asserted in this case, Claim 1 of U.S. Patent No. 6,959,293 ("'293 Patent").

The first term—"the histogram calculation units being configured to form a histogram representative of the parameter"—was previously construed by the PTAB, but not by this Court or any other federal court. As part of an IPR filed by third-party Samsung, the PTAB construed the term as "the at least two histogram calculation units being configured to each form a histogram representative of at least one ***common parameter***," and IPT's proposal in this case follows the PTAB's construction. Ex. E (*Samsung* IPR FWD) at 11-14. But as discussed below, the PTAB's construction's requirement of a "common parameter" is not supported by the claim language and excludes ***every*** specification embodiment. Accordingly, the Court should not follow the PTAB's construction and expressly reject any requirement of a "common parameter."

For the other two terms—"histogram" and "wherein the validation signal . . ."—LG proposes constructions that Judge Gilstrap previously rejected as part of a prior litigation between IPT and Samsung. *See Image Processing Technologies, LLC v. Samsung Elecs. Co.,* No. 2:16-cv-00505-JRG, 2017 WL 2672616, at *4–9 (E.D. Tex. June 21, 2017). LG re-submits the proposed constructions here to preserve its right to appeal.

# II. TECHNICAL AND PATENT BACKGROUND




The '293 Patent and Claim 1 are directed to the formation and use of a "histogram" to detect features in image frames shown on a computer screen, where each image frame is composed of pixels. Ex. A ('293 Patent) at Abstract, 6:28-36. An example histogram is shown to the right.

Histograms are basic statistical tools, and the ’293 Patent uses them in the image processing context. The x-axis of the histogram shows bins for possible values of a “parameter.” For example, a parameter could be brightness of pixels in an image frame, and in that example, each bin would represent a different brightness range (e.g., the bins on the left represent darker values, while the bins on the right represent brighter values). Each pixel in an image has a given brightness value, and those pixels are sorted into the bins depending on their brightness value. The y-axis counts the number of pixels in each bin, corresponding to the number of pixels having a particular brightness value. The histogram above could be used to conclude that the underlying image is too bright, and a computer could then reduce the brightness to make the image easier to view.

The ’293 Patent’s Figure 1 (annotated below) depicts the patent’s overall system for processing image frames. *Id*. at 4:39-40, 6:35-36. In Figure 1, a “camera 22” or “CMOS imaging device 32” on the left produce a video signal “S(t)” “composed of a succession of frames, wherein each frame includes a succession of pixels.” *Id.* at 7:7-23. The image frames are processed to “generate . . . signals DATA(A) . . . DATA(E).” *Id*. at 8:20-23. Each of the DATA(A) to DATA(E) signals (colored in red, tan, aqua, green, and purple below) corresponds to data for a generic parameter, A, B, C, D, or E, that describes an attribute of the image frame. The patent gives examples of what such parameters could be, including “tone (hue), saturation and luminance signals, as well as the velocity, direction, and intensity signals.” *Id.* at 19:35–41, 24:18–20.




FIG. 1 PRIOR ART

As Figure 1 shows, data values for the five parameters (A, B, C, D, and E) are each sent to one of five "associated histogram calculation units 1A, 1B, . . . , 1E.," and each unit forms a histogram for the received parameter. *Id.* at 6:41-42. For example, histogram calculation unit 1A (red box) forms a histogram for parameter A.

Each of the five histogram calculation units are generic and interchangeable, such that each unit can form a histogram for any of the five parameters. Each unit has the structure shown in Figure 3, annotated below, which forms a histogram for parameter A. *Id.* at Fig. 3, 8:37-43.




FIG. 3

The histogram unit includes a "memory 100" (red) for storing and updating a histogram for parameter A. *Id.* at 8:45–52. The histogram unit also includes a "[c]lassifier unit 101" (blue) for "storing certain possible level values . . . for the levels of parameter A." *Id.* at 9:27–35. The classifier "provide[s], on its output 101s, a value 1 when the parameter A associated with the said pixel" matches a pre-stored level or output a value 0 otherwise. *Id.* The classifier provides its output classification signal, labeled "101s" or "inA" in the figure, to the time coincidences bus 111 (yellow). *Id.* at 9:35–41.

The '293 Patent uses multiple histogram units, and the embodiment of Figures 1 and 3 has five units (1A, 1B, 1C, 1D, 1E), each forming the histogram for a different corresponding parameter (A, B, C, D, E). Each of the histogram units calculates its own classification signal, shown together in Figure 3 as the signals "inE, . . . inC, inB, inA." *Id*. at 9:36-50. Those signals are sent on the common time coincidence bus 111 (yellow in Figure 3, above), so that the time coincidence unit (purple) in each histogram unit can consider the results of the classifications from all five histogram units. *Id.* In particular, the time coincidences unit 102 (purple) "compares the values" received from various classifiers to values programmed into its "register 102r." *Id*. at 9:42-49. Based on this comparison, the time concidence unit sends either (1) "an enabling signal equal to 1 when there is a coincidence between the register values . . . and the corresponding data received from the bus 111," or (2) "a zero value in the reverse case." *Id.* If the time coincidences unit outputs an enabling signal equal to 1, the histogram stored in memory 100 is updated and incremented to reflect a new data value for parameter A. *Id.* at 8:55-61.

## III. ARGUMENT FOR DISPUTED TERMS

### A. "the histogram calculation units being configured to form a histogram representative of the parameter"

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| "the at least two histogram calculation units being configured to each form a histogram representative of at least one common parameter" | Plain and ordinary meaning<br><br>Does ***not*** include a requirement that all of the at least two histogram calculation units form a histogram representative of the same (or a common) parameter |

Claim 1 recites a system with "at least two histogram calculation units," and this disputed claim term requires that those units "form a histogram representative of the parameter." As discussed in Section II (Background), the "parameter" represents a characteristic of an image frame and its pixels, such as brightness, saturation, velocity, direction, or intensity.

The parties' dispute is whether the "the parameter" processed by the histogram calculation units (1) must be the same or "common parameter" (IPT's interpretation) or (2) could either be the same or a different parameter (LG's interpretation). IPT's attempt to impose a "common parameter" requirement hinges on the false premise that "the parameter" must be singular. But the term finds antecedent basis in the phrase "at least one parameter" earlier in the claim, which clearly permits multiple parameters. Nothing in the claim requires that the multiple parameters processed by the histogram calculation units be the same or common. To the contrary, the specification compels the opposite conclusion: in ***every*** embodiment, the parameters processed by the histogram calculation units either are or can be ***different*** from each other.

#### 1. The Court Should Not Follow The PTAB's Incorrect And Unchallenged Construction

With little intrinsic evidence to support for its proposal, IPT pays scant attention to the merits. IPT's leading argument is that its proposal follows the broadest reasonable construction

adopted by the PTAB in an IPR filed by Samsung, and the Court must defer to the PTAB's interpretation adopted under a different claim construction standard. Dkt. 53 ("IPT Br.") at 6–7.

But this Court has repeatedly held that deference to prior constructions of other forums, like the PTAB, is not absolute. *E.g.*, *United Services Automobile Association v. PNC Bank N.A.*, Nos. 2:20-CV-00319-JRG, 2021 WL 5451020, at *6 (E.D. Tex. Nov. 22, 2021). In *United Services*, this Court declined to follow two PTAB constructions. *Id.* at *24, 35–36. This Court found the specification passages cited by the PTAB did "not persuasively support the PTAB's conclusion," failed to give full effect to the claim language, and for one term, the "persuasive value of the PTAB construction is undercut . . . by the lack of competing claim construction proposals at the PTAB regarding the term construed by the PTAB." *Id.*

Similarly, in the *AGIS Software Development LLC v. Google LLC*, the Court declined to follow five different PTAB constructions, finding the "PTAB's analysis to be unpersuasive." No. 2:19-CV-361-JRG, 2020 WL 7229753, at *22, 25, 27, 29, 32 (E.D. Tex. Dec. 8, 2020). The *AGIS* decision also refutes IPT's contention that LG's construction must be rejected because it is broader than the broadest reasonable construction the PTAB adopted in Samsung's IPR. IPT Br. at 6–7. In *AGIS*, the PTAB's prior final written decision had also construed the claims under the broadest reasonable construction standard. Ex. 5 at 10–11. This Court nonetheless adopted broader constructions. As one example, for the means-plus-function term "means for attaching a forced message alert software packet . . .," the PTAB construed the term's structure to be "2:11–13, 7:8–20, 7:43–63, 8:25–30, and Fig. 3A" in the specification. *AGIS*, 2020 WL 7229753, at *25. This Court disagreed, finding that the "disclosures excluded by the PTAB . . . describe functionality that is part of the disclosure of performing the claimed function." *Id.* The Court therefore adopted a broader construction and structure of "7:8–8:36" in the specification. *Id.*

Here, the PTAB's analysis in Samsung's IPRs is also unpersuasive and should not be followed. As in *United Services*, the PTAB accepted IPT's proposed construction without any competing proposal or argument from Samsung. Ex. E (*Samsung* IPR FWD) at 12–14.[1] Indeed, as IPT points out, its proposal was the "implied construction that" Samsung's IPR petition adopted and "applied in its analysis." IPT Br. at 9–10. Without any dispute over the construction, the PTAB's reasoning in support of the construction simply quoted or paraphrased sections of the '293 Patent cited by IPT's preliminary response, with little explanation. *Compare* Ex. E (*Samsung* IPR FWD) at 12–14, *with* Ex. 6 (*Samsung* IPR, IPT POPR) at 10–14. As discussed below, the sections cited by the PTAB and IPT do not support a "common parameter" requirement, while other sections and the broader context of the '293 Patent dispel any such requirement.

**2. The Claim Language Does Not Support IPT's Proposal Because "the parameter" Finds Antecedent Basis In "at least one parameter," Which Is Not Singular**

Nothing in Claim 1 imposes any restriction on which parameters are processed by the "at least two histogram calculated units," let alone that the parameters must be the same or common.

In arguing otherwise, IPT's brief, like its IPR filings and the PTAB's decision, hinges on a false premise: that "the parameter" in the disputed term is singular, and that, therefore, the histogram calculation units must be processing the same single parameter. IPT Br. at 8 ("The claim requires that ***the plural*** histogram calculation units must each form a histogram representative of ***the singular*** parameter.") (emphasis original); Ex. E (*Samsung* IPR FWD) at 12

[1] To the extent IPT contends that LG's pending IPR petition does not challenge the PTAB's prior construction, as LG's petition states, LG does not need to challenge the construction because the petition's two grounds anticipate or render obvious the disputed term, even under the PTAB's construction requiring that the histogram calculation units process a "common parameter." Ex. 8 at 21 ("Petitioner reserves the right to dispute this construction in other proceedings, including to the extent the claim is argued to require a 'common' parameter. However, there is no need to address that dispute here, where the prior art discloses Claim 1 even under the Board's narrow 'common parameter' construction[] . . . ."); *see also id.* at 16–17, 49–51, 65, 73.

("[E]ach of the 'histogram calculation units,' as recited in claim 1, must form a histogram representative of the *singular parameter*.") (emphasis original); Ex. 6 (*Samsung* IPR, IPT POPR) at 11 ("The claim requires that the plural histogram calculation units must each form a histogram representative of the singular parameter.") (emphasis original).

IPT's argument fails because "the parameter" finds antecedent basis in the phrase "at least one parameter," which appears in the prior limitation of Claim 1 reciting "at least two histogram calculation units for the treatment of the ***at least one parameter***." The phrase "the at least one parameter," in turn, finds antecedent basis in the preamble, which recites: "A visual perception processor for automatically detecting an event occurring in a multidimensional space (i, j) evolving over time with respect to ***at least one digitized parameter***."

Thus, the central premise of IPT's and the PTAB's construction—that "the parameter" is singular and limited to only one parameter—is simply wrong. The Federal Circuit has "repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). And "[t]he subsequent use of definite articles 'the' or 'said' in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning." *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012).

Applying these principles in *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, the Federal Circuit ruled that the term "a pre-soaked fabric roll" was not limited to a single roll and permitted multiple rolls, and that a later phrase in the claim, "said fabric roll," also permitted multiple rolls because its antecedent basis was the term "a pre-soaked fabric roll." 512 F.3d 1338, 1342–43 (Fed. Cir. 2008). The Federal Circuit reasoned that "the use of a definite article ('said' or 'the') to refer back

to an initial indefinite article does not implicate, let alone mandate the singular" and "[b]ecause the initial phrase carries no definitive numerosity," the later phrase "said fabric roll" did "not alter that meaning" to require a single roll. *Id*. Similarly, in *Transocean Offshore Deepwater Drilling, Inc. v. Pacific Drilling, Inc.*, a Texas district court ruled that the claim terms "a well" and "the well" were not limited to a single well, and with respect to "the well," the court found the term to be "an anaphoric phrase that merely refers back to the initial antecedent phrase [i.e., 'a well,']" that was non-singular. No. H–13–1088, 2015 WL 3422410, at *32–34 (S.D. Tex. May 27, 2015).

Here, the facts more strongly favor finding that "the parameter" is non-singular because its antecedent basis is not merely "a parameter," but instead "***at least one*** digitized parameter," which expressly permits multiple parameters. Considering the antecedent bases for the disputed term, the term is properly read as "the <u>at least two</u> histogram calculation units being configured to form a histogram representative of the <u>at least one</u> parameter." Nothing about this term (or any other language in Claim 1) imposes any requirement on what parameter(s) each unit processes. In particular, nothing about the term suggests, let alone requires, that the units must process the same, "common parameter" as IPT proposes.

### 3. The Specification's Embodiments Disclose Histogram Calculation Units, Each Processing A Different Parameter

Like Claim 1, the specification does not impose any requirement that multiple histogram calculation units must process the same, "common parameter." To the contrary, the specification dictates the opposite conclusion: ***all*** of its embodiments disclose histogram calculation units that each form a histogram for a ***different*** parameter. A "claim construction that excludes the preferred embodiment is rarely, if ever, correct." *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1378–79 (Fed. Cir. 2013) (internal quotations omitted). Thus, IPT's proposal requiring that units to process a "common parameter" should be rejected as it excludes ***every*** embodiment.

The specification's first embodiment of Figure 1 (annotated below) shows five histogram calculation units (1A, 1B, 1C, 1D, 1E), where each unit forms a histogram for a different parameter (A, B, C, D, E, respectively). *See* Ex. A ('293 Patent) at 6:42–43, 7:30–33 ("FIG. 1 represents several associated histogram calculation units 1A, 1B, . . . , 1E in the same perception unit" that receive "inputs identified as DATA(A) . . . DATA(E).").[2]




FIG. 1 PRIOR ART

Another embodiment of Figure 30 (annotated below) similarly "illustrates the implementation of a set of histogram calculation units 1 enabling the management of any number of parameters A, B, C, D, E." *Id.* at 20:26–30. Like Figure 1's embodiment, each of the five histogram units, 1A, 1B, 1C, 1D, 1E, forms a histogram for one of five different corresponding parameters, A, B, C, D, E, respectively. Neither embodiment of Figure 1 nor Figure 30 discloses

[2] Although Figure 1 is labeled as "prior art," the specification states: "The histogram calculation unit 1 of the ***invention*** is represented in its context by FIGS. 1 and 2." Ex. A ('293 Patent) at 6:35–36 (emphasis added). Thus, Figure 1 depicts an embodiment of the '293 Patent's alleged invention. The "prior art" label refers to how this embodiment uses certain components, such as the "histogram calculation units," "spatial processing unit 6," and "temporal processing unit 5," that the patent admits were known in the prior art. *Id.* at 7:23–27.

two or more units processing the same parameter, as IPT's proposal requires.



FIG. 30

IPT's brief, like its PTAB filings and the PTAB's decision, completely ignores the above embodiments and instead limits its analysis of the specification to only one embodiment of Figure 32. IPT Br. at 8; Ex. E (*Samsung* IPR FWD) at 13; Ex. 6 (*Samsung* IPR, IPT POPR) at 12–13. But even Figure 32's embodiment does not support IPT's position for three reasons.

First, as an initial matter, nothing about Figure 32 suggests that any of multiple histogram units must form a histogram for the same parameter. To the contrary, Figure 32 (annotated below) shows ***sixteen*** histogram units (labeled 1a00 to 1a33, arranged in a four-by-four matrix), and those sixteen units process ***twenty-one*** different "parameters D, V, S, T, L, p0, p1, . . . , p15." Ex. A ('293 Patent) at 21:36–42.[3] Because there are ***more*** parameters (twenty-one) than histogram calculation units (sixteen) and each unit can only process one parameter at a given time, each unit

[3] The parameters D, V, S, T, and L correspond to direction, speed, saturation, tone, and luminance. *See* Ex. A ('293 Patent) at 7:30–34, 20:43–47. The parameters "p0, p1, p2, . . . , p15 . . . are slopes of reference axes." *Id.* at 21:38–43.

can form a histogram for a ***different*** parameter than of the other units.



FIG. 32

Second, while not argued by IPT's brief, the PTAB's decision reasoned that each "histogram calculation unit can be timeshared among different parameters during each frame." Ex. E (*Samsung* IPR FWD) at 13. But a "timeshared" embodiment, described in the following passage in the specification, discloses the ***opposite*** of IPT's construction:

> In one embodiment, a histogram calculation unit is time-shared among different parameters during each frame. . . . . ***[H]istogram calculation unit*** 1 according to this embodiment ***calculates histograms and associated statistics for two or more parameters*** (e.g., Data (A) and Data (C)) during each frame.

Ex. A ('293 Patent) at 21:18–23 (emphasis added). With timesharing, a ***single unit*** calculates the histogram for ***multiple parameters***. For example, a single unit could calculate a histogram for parameters A and C. But IPT's proposal requires the inverse numerical relationship between units and parameters: ***multiple units*** calculate histograms for the same ***single parameter***.

Third, IPT's brief cites the only sentence in the entire specification that could conceivably allow two histogram calculation units to process the same parameter, which states that in Figure

32 "control unit 513 provides overall control and determines which of the parameters L, T, S, V, D, p0, p1, . . . , p15 are to be processed at a given time by ***one or several*** dedicated polyvalent histogram unit(s)." *Id*. at 21:43–48 (emphasis added); IPT Br. at 9. But the sentence's use of "one or several" signals broad flexibility as to which units process which parameters. The possible scenarios include: (1) "one" unit processing a single parameter; (2) "one" unit processing multiple parameters, as in the "timeshared" embodiment described above; or (3) "several" units processing one of the twenty-one parameters. The last scenario is just one of three possible scenarios permitted in Figure 32's embodiment—yet it is the only scenario permitted under IPT's proposal.

The disputed term should not, therefore, be construed to require that multiple histogram calculation units process the same, "common parameter," because that is only one of three scenarios that could arise during the operation of one embodiment of Figure 32. The other embodiments (e.g., Figures 1 and 30) and the other scenarios for Figure 32's embodiment all disclose each unit processing a different parameter. "The Federal Circuit has consistently held that particular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Seagen Inc. v. Daiichi Sankyo Co.*, No. 2:20-CV-00337-JRG, 2021 WL 4168660, at *9 (E.D. Tex. Sept. 14, 2021) (internal quotations omitted). "Embodiments in the specification—even if there is only one embodiment—cannot limit the scope of the claims absent the patentee's 'words or expressions of manifest exclusion or restriction.'" *Apple Inc. v. Wi-Lan Inc.*, 25 F.4th 960, 967 (Fed. Cir. 2022). Applying this principle in *Effective Exploration, LLC v. Classic Operating Co., LLC*, this Court rejected a construction that "would import a centralized-entry-bore feature from an embodiment when that feature is expressly described as optional and would exclude the disparate-entry-bore feature described in a separate embodiment." No. 2:14–cv–00869–JRG–RSP, 2015 WL 5012139, at *11 (E.D. Tex. Aug. 21, 2015).

Likewise, here, the Court should reject IPT's attempt to import one conceivable usage scenario of one embodiment of Figure 32, while excluding all other scenarios of Figure 32 and all other embodiments from the scope of Claim 1. Further, there are no words in Claim 1 expressing exclusion of, or restriction to, any embodiment or usage scenario in the specification. Rather, just like the specification's embodiments, the disputed term when properly read in light of its antecedent basis—"the <u>at least two</u> histogram calculation units being configured to form a histogram representative of the <u>at least one</u> parameter"—signals broader effect. Under this claim language: (1) the claimed units could each process a different parameter; (2) each one of the units could process multiple parameters; or (3) multiple units could process the same "common" parameter. The term should therefore be given its plain meaning, and should not be limited to only one usage scenario as required by IPT's proposal.

### B. "histogram"

| Plaintiff's Proposal | Defendants' Proposal |
| --- | --- |
| "a statistical representation of the frequency of occurrence with which values of a parameter fall within a series of intervals" | "a statistical representation of the frequency of occurrence with which values of a parameter fall within defined intervals of the range of values of the parameter" |

LG acknowledges that the Court previously construed "histogram" to mean "a statistical representation of the frequency of occurrence with which values of a parameter fall within a series of intervals" and that IPT's proposal follows that prior construction. LG proposes a different construction of "histogram" to preserve its right on appeal to challenge the Court's prior construction and to argue for its proposed construction.

The parties agree that a histogram is a statistical representation and that it shows the frequency of occurrence of values of a parameter within intervals. The primary dispute is whether a histogram is ***any*** statistical representation with intervals (as IPT proposes), or a statistical

representation formed by dividing a parameter's ***range of values*** into ***defined*** intervals and counting how often the value of that parameter falls within each defined interval (as LG proposes). The intrinsic evidence and textbooks on statistical methods confirm that LG's construction is correct and adopts the well-settled meaning of the term. IPT ignores this clear evidence and improperly seeks to expand the term to cover any statistical representation or essentially any mechanism that counts the occurrence of something within intervals.




Consistent with LG's construction, a histogram is commonly defined as "a graph of a frequency distribution in which rectangles with bases on the horizontal axis are given widths equal to the ***class intervals*** and heights equal to the corresponding frequency." Ex. 1 (Random House (1997)) at 907 (emphasis added). To form a histogram, these intervals are defined within a range of values:

> Divide the ***range*** of the measurements (the difference between the largest and smallest measurements) by the appropriate number of class intervals desired. . . . To construct a frequency histogram draw two axes: a horizontal axis labeled with the ***class intervals*** and a vertical axis labeled with the frequencies. Then construct a rectangle over each ***class interval*** with a height equal to the number of measurements falling within a given subinterval.

Ex. 2 (An Introduction to Statistical Methods and Data Analysis (1984)) at 12–13 (emphasis added). The requirement that the parameter being histogrammed have a "range of values," as LG's construction requires, is the key feature of histograms because histograms compare data that can take on a range of values, *i.e.*, are quantitative, as opposed to data that are qualitative or categorical:

> First, the distinction between bar charts and histograms is based on the distinction between **qualitative** and **quantitative** variables. Values of qualitative variables vary in kind but not degree and hence are not measurements. For example, the variable political party affiliation can be categorized as Republican, Democrat, or

> other, and, although we could label the categories as one, two, or three, these values are only codes and have no quantitative interpretation. In contrast, quantitative variables have actual units of measure. . . . Bar charts are used to display frequency data from qualitative variables; histograms are appropriate for displaying frequency data for quantitative variables.

*Id.* at 13–14 (emphasis original). Similarly, the requirement that this range of values be divided into defined intervals is core to what distinguishes histograms from other data representations:

> A key distinction between the histogram and the bar chart described earlier is that here the adjacent bars are made to touch. The reason for this is to emphasise [*sic*] the fact that the horizontal axis on a histogram represents a continuous number scale. It is important to be aware that the bars on a histogram do not represent separate categories, as they do on a bar chart, but, rather, ***adjacent intervals*** on a number line. . . . The bar chart is useful for depicting separate ***categories***, while the histogram describes the 'shape' of data that have been measured on a continuous number scale.

Ex. 3 (Teach Yourself Statistics (1994)) at 37 (emphasis added); *see also id.* (Fig. 3.9); Ex. 7 (*Samsung/IPT*, Dkt. 138-7 Stevenson Decl.) ¶¶ 25–29.

The '293 Patent describes histograms in a manner fully consistent with this ordinary meaning and LG's construction. In particular, the range of values of the parameter is divided into defined intervals to generate the histogram. For example, a histogram of values of "parameter A" is formed by dividing the possible values of A into n intervals:

> Analysis memory 100 includes a number, n, of addresses, d, ***equal to the number of possible levels for the values of the parameter A*** that must be discriminated.

Ex. A ('293 Patent) at 8:47-50 (emphasis added). Similarly, the related '445 Patent cited by IPT states that because luminance may take on values from 0 to 255, a luminance histogram is formed by dividing this range into 256 intervals. Eight address bits are used to specify these 256 intervals (since $2^8$=256):

> [H]istogram formation block 24 receives the delayed digital video signal SR and enables a histogram to be formed for the luminance values of the video signal. Since the luminance of the signal will generally be represented by a number in the range of 0-255, histogram formation block 24 is preferably a memory addressable with 8 bits, with each memory location having a sufficient number of bits to

correspond to the number of pixels in a frame.

Ex. B ('445 Patent) at 16:66-17:6. Every histogrammed parameter in the patent takes on a range of values that is divided into defined intervals for forming the histogram. *Id.* at 17:7-41.

IPT's definition is overly broad because it encompasses any statistical representation or counter that compares categories within intervals. IPT's definition does not require that the histogram have "defined" intervals of the "range of values" for the parameter being histogrammed or even that the intervals represent values of the same parameter.

IPT argues that histogram intervals in the specification are not "defined" because they "can be adapted in real-time," noting that histogram units for speed and direction are configured to have eight addresses and a histogram for luminance is configured to have 256 addresses. IPT Br. at 4. But this just proves LG's point. Each unit is configured to include a number of ***defined intervals***, based on the parameter for which it will calculate a histogram. Ex. A ('293 Patent) at 8:47-50 ("Analysis memory 100 includes a number, n, of addresses, d, ***equal to the number of possible levels for the values of the parameter A*** that must be discriminated.") (emphasis added). Thus, each histogram formed has defined intervals based on the range of values of the parameter.

IPT's suggestion that reference to "real-time" is intended to mean that the intervals can be changed in the middle of calculating a histogram has no support in any of the specifications. The reference to "real-time" IPT cites describes a particular embodiment in which the classifiers are updated ***after*** a histogram has been calculated. *Id.* at Fig. 5, 11:15-25 (describing "real time updating of the classifier" after the processing of an image frame ends). In fact, any such change while a histogram was being calculated would not produce a histogram. Ex. 7 (*Samsung/IPT*, Dkt. 138-7 Stevenson Decl.) ¶ 29.

IPT's construction is contrary to what is described in the '293 Patent and far broader than the ordinary meaning of the term. It should, therefore, be rejected.

### C. "wherein the validation signal is produced from time coincidences signals from the time coincidence bus so that the calculation of the histogram depends on the classification signals carried by the time coincidence bus"

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| Plain and ordinary meaning. | "wherein the validation signal is produced when two or more classification signals satisfy stored conditions at the same time" |

LG acknowledges that the Court previously adopted a plain and ordinary meaning construction of "wherein the validation signal is produced from time coincidences signals from the time coincidence bus so that the calculation of the histogram depends on the classification signals carried by the time coincidence bus," and IPT's proposal follows that prior construction. LG proposes a different construction to preserve its right on appeal to challenge the Court's prior construction and to argue for its proposed construction.

The terms "coincidence signals" and "coincidence bus" represent a key feature of the claimed system—the use of two or more classification signals to determine whether to include a particular pixel in the histogram. Ex. A ('293 Patent) at 9:37–50. But "coincidence signals" and "coincidence bus" are not common lay terms. Thus, a lay juror will have no understanding of these terms absent direction from the Court. LG's constructions are supported by the specification and claims and give meaning to the word "coincidence." IPT seeks to avoid construction and, thereby, read the coincidence limitations out of the claims.

The specification consistently describes the coincidences unit as receiving inputs from multiple classifiers and evaluating them at the same time:

> Time coincidences unit 102 is connected to the bus 111, and includes at least one register 102r and receives, for each pixel, ***the output values (inE, . . . , inB, inA) of the classifiers*** 101 of the various histogram calculation units 1 connected to the bus 111.
>
> This time coincidences unit 102 compares the values thus received to those contained in its register 102r and transmits, on its output 102s, for each pixel, an enabling signal equal to 1 when there is a coincidence between the register values

> equal to 1 and the corresponding data received from the bus 111, and a zero value in the reverse case, which corresponds to the following Boolean function:
>
> $out=(\sim in_0+Reg_0)(\sim in_1+Reg_1) \ldots (\sim in_n+Reg_n)(in_0+in_1+ \ldots in_n)$[.]

Ex. A ('293 Patent) at 9:37–50 (emphasis added). Thus, the very purpose of the "coincidence unit" is to evaluate coincidences between the multiple classifiers at the same time to construct the logical validation signal "out" described above. Indeed, the word "coincidence" means "[t]he state or fact of coinciding," and "coinciding" means "tak[ing] place at the same time." Ex. 4 (Webster's New College Dict. (2001)) at 218. And LG's construction gives this word its proper meaning. Ex. 7 (*Samsung/IPT*, Dkt. 138-7 Stevenson Decl.) ¶¶ 30–33.

Every embodiment in the '293 Patent includes a coincidence unit that evaluates the outputs of multiple classification units at the same time. Furthermore, the patent states that "[t]he invention," as a whole, includes "said global enabling signal being made of a set of individual time coincidences signals, each one corresponding to a parameter DATA(A), DATA(B), . . . , DATA(E)." Ex. A ('293 Patent) at 4:3, 4:20–23. "When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).

The claim language fully supports, and indeed dictates, LG's construction by reciting plural classification signals compared to "criteria" (plural) in the coincidences unit. Ex. A ('293 Patent) at Claim 1 (reciting "calculation . . . depends on the ***classification signals*** carried by the time coincidence bus") (emphasis added). The same is true in the '293 Patent's other, unasserted claims. *See id.* at Claim 3 (reciting "time coincidences unit outputs a positive global enabling signal when ***all the individual time coincidences signals*** are positive"); Claims 18 and 22 (reciting a "coincidence unit coupled . . . to receive selected ***coincidence criteria***"); Claim 29 (reciting a step that occurs "when classified data satisfies predetermined ***time coincidence criteria***"). Further,

Figure 3 shows that "signals from outside the histogram calculation unit" supplied by the bus 111 to the coincidences unit 102 are "inE . . . inC, and inB," which are the outputs of the other classifiers in the system. Ex. A ('293 Patent) at 8:20–23, 9:37–50. All of these classification conditions are evaluated ***at the same time*** so the resulting validation signal can control whether or not that pixel is used in histogram formation. *Id.*

While IPT argues for "plain meaning," IPT actually does the opposite and applies special meanings in its brief. For example, IPT argues that the "'time coincidences' signal and the 'classification' signal refer to the same thing—a signal that results from 'a comparison of the parameter and a selected criterion C." IPT Br. at 11. And IPT's argument that the claims do not require evaluating outputs from multiple classifiers at the same time effectively reads the coincidence limitation out of the claims entirely. The classifier already compares the value of a pixel parameter to a classification criterion. The coincidence unit's only function is to evaluate multiple classification outputs to create a validation signal controlling whether a pixel should be added to the histogram. Without multiple inputs, the coincidence unit cannot evaluate any "coincidences" and is nothing more than a pass-through, effectively reading the limitation out of the claim. Thus, IPT's construction is impermissibly broad and should be rejected.

## IV. CONCLUSION

For the reasons stated herein, LG requests that the Court adopt LG's proposed claim constructions.

Dated: March 28, 2023

Respectfully submitted,

*/s/ Michael E. Jones with permission, by David S. Almeling*
Michael E. Jones
(TX Bar No. 10929400)
mikejones@potterminton.com
Shaun W. Hassett
(TX Bar No. 24074372)
shaunhassett@potterminton.com
Potter Minton, PC
102 North College Avenue, Suite 900
Tyler, TX 75702
Telephone: 903-597-8311
Facsimile: 903-593-8406

David S. Almeling (Pro Hac Vice)
dalmeling@omm.com
Mark Liang (Pro Hac Vice)
mliang@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone: 415-984-8700
Facsimile: 415-984-8701

Nicholas Whilt (Pro Hac Vice)
nwhilt@omm.com
Brian Cook (Pro Hac Vice)
bcook@omm.com
Clarence A. Rowland (Pro Hac Vice)
crowland@omm.com
O'MELVENY & MYERS LLP
400 S. Hope Street
Los Angeles, CA 90071
Telephone: 213-430-6000
Facsimile: 213-430-6407

***Attorneys for Defendants LG ELECTRONICS INC., and LG ELECTRONICS USA, INC.***