# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

**IMAGE PROCESSING TECHNOLOGIES, LLC,**

**Plaintiff**

**v.**

**SAMSUNG ELECTRONICS CO., LTD., ET AL.,**

**Defendants.**

**Civil Action No. 2:16-CV-0505-JRG**
**The Hon. Rodney Gilstrap**

**JURY TRIAL DEMANDED**

**HEARING: June 2, 2017, 1:30 PM, CTRM 106 (MARSHALL)**

**DECLARATION OF DR. ROBERT L. STEVENSON IN SUPPORT OF SAMSUNG ELECTRONICS CO., LTD. AND SAMSUNG ELECTRONICS AMERICA, INC.'S <u>RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

I, Robert L. Stevenson, declare as follows:

**I. Introduction**

1. I have been retained by Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively "Samsung") to provide expert opinion in the litigation styled *Image Processing Technologies, LLC v. Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.*, No. 2:16-CV-0505-JRG, in the District Court for the Eastern District of Texas.

2. I am over eighteen years old and would competently testify to the matters set forth herein if called upon to do so.

3. I understand that Image Processing Technologies, LLC ("IPT") has accused Samsung of infringing the following six U.S. patents: Nos. 8,989,445 ("the '445 Patent"); 7,560,015 ("the '015 Patent"); 8,805,001 ("the '001 Patent"); 8,983,134 ("the '134 Patent"); 6,959,293 ("the '293 Patent"); and 6,717,518 ("the '518 Patent").

4. I understand this declaration is to be submitted in support of Samsung's responsive claim construction brief. I have been asked to give my opinions on how a person of ordinary skill in the art ("POSA") at the time of the alleged invention would have interpreted certain terms recited in the claims of the asserted patents. I understand that IPT has alleged a priority date for the '445, '015, '001, and '134 Patents of 1996; a priority date of 2000 for the '293 Patent; and a priority date of 1998 for the '518 Patent. My opinions are based on an understanding of the relevant field and level of ordinary skill in the art in the late 1990's and early 2000's time frame.

**A. Background and Qualifications**

5. My background and qualifications are set forth in my Curriculum Vitae, which I have attached as Exhibit A1. A brief summary is provided here.

6. I am currently Associate Chair, Director of Undergraduate Studies at the Department of Electrical Engineering at the University of Notre Dame in Notre Dame, Indiana. I am also a Professor in the Department of Electrical Engineering, a position I have held since 2002. I am also a Professor in the Department of Computer Science and Engineering, a position I have held since 2003.

7. Prior to that, I was an Associate Professor of Electrical Engineering at Notre Dame from 1996 to 2002 and a Visiting Associate Professor of Electrical and Computer Engineering at the University of Delaware from 1996 to 1997.

8. Before that, I was an Assistant Professor of Electrical Engineering at Notre Dame from 1990-1996 and also worked as a Research Associate at Intel Corporation in 1994 and as a Research Associate for the Air Force Office of Scientific Research in Rome, New York in 1993.

9. I received a Ph.D. in Electrical Engineering in 1990 from Purdue University and a B.S.E.E. in Electrical Engineering from the University of Delaware in 1986.

10. My professional career has been focused largely on Image and Video Processing, and I have engaged in extensive research and development in these fields. I was associate editor of IEEE Transactions on Image Processing from 1999-2003 and have chaired multiple conferences and symposia on imaging, including the SPIE/IS&T Symposium on Electronic Imaging in 2004 and SPIE/IS&T Conferences on Visual Information; Image and Video Processing; Visual Communications and Image Processing; Computational Imaging, and others from 1994 to the present.

11. I have authored or co-authored dozens of articles in refereed journals and have authored several textbook chapters and over 100 conference papers. I also serve as a reviewer for a number of archival journals, including *IEEE Transactions on Image Processing*; *Computer*

*Vision, Graphics, and Image Processing*; *Journal of Mathematical Imaging and Vision*; *IET Image Processing*; and others.

12. Based on my background and experience, as set forth more fully in my CV, I am familiar with the state of the art in the field of Image Processing in the 1996 to 2000 time frame. I am a technical expert in the fields relating to the asserted patents and other related fields, and I remain an active researcher in these fields.

**B. Compensation**

13. I am being compensated for my time spent on this case at my customary consulting rate of $600 per hour. My compensation is in no way dependent on my opinions expressed herein or on the outcome of this case. I have no affiliation with or financial interest in any of the parties to this litigation.

**C. Materials Considered**

14. In forming my opinions set forth herein, I considered the asserted patents and relevant portions of their prosecution histories. I also considered IPT's opening claim construction brief, the declaration of Dr. Agouris, and the evidence submitted by IPT. In addition, I considered the materials I refer to or cite in this declaration. I also relied on my own experience and knowledge as a researcher in the field of digital image processing and analysis and other fields, as set forth in my CV.

**D. Level of Ordinary skill in the art**

15. Based on my review of the asserted patents' specifications and claims, I believe a person of ordinary skill in the art in the time period of 1996 to 2000 would have had either (1) a Master's Degree in Electrical Engineering or Computer Science or the equivalent plus at least a year of experience in the field of image processing, image recognition, machine vision, or a related field or (2) a Bachelor's Degree in Electrical Engineering or Computer Science or the

equivalent plus at least three years of experience in the field of image processing, image recognition, machine vision, or a related field. Additional education could substitute for work experience and vice versa.

16. In determining the level of ordinary skill in the art, I considered, for example, the type of problems encountered in the art, prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field.

17. I was one of at least ordinary skill in the art as of the 1996 to 2000 time period, and my opinions concerning the asserted patent claims are from the perspective of a person of ordinary skill in the art, as set forth above.

18. I have reviewed Dr. Agouris's opinion stating that a POSA would have an undergraduate degree in electrical engineering or image processing or a related field, followed by at least two years of graduate coursework, and also at least early-stage thesis research in digital image processing. While this differs slightly from my definition of a POSA, my opinions would not change if I applied Dr. Agouris's definition of a POSA.

## II. Legal Standards

19. I have been informed that the following legal principles govern claim construction, and they have informed my analysis.

20. I understand that "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.; C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network*

*Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

21. I further understand that "claims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); see also *Phillips*, 415 F.3d at 1323.

22. I further understand that the prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). I also understand that technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms. *Id.* at 1318.

23. I understand that every claim must distinctly claim and point out with particularity the subject matter that is regarded as the invention. 35 U.S.C. § 112. Failure to do so will render a claim invalid as indefinite. "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

## III. Terms for Construction

24. Based on my review of the materials in this case and on my own background and experience, it is my opinion that the constructions proposed by Samsung are correct. My opinions are set forth in detail below.

### A. "histogram" and "parameter[s]"

| Claim Term | Samsung's Construction | IPT's Construction |
|---|---|---|
| "histogram" ('293, Claims 1, 3, 18, 22, 29; '445, Claims 1, 9, 14, 24, 26, 27; '001, Claims 1, 3, 7, 8; '015, Claim 6; '134, Claims 1, 4; '518, Claim 39) | "a statistical representation of the frequency of occurrence with which values of a ~~continuous variable~~ parameter fall within defined intervals of the range of values of the parameter" | "a statistical representation of the frequency of occurrence of values of a 'parameter'" |
| "parameter[s]" ('293, Claims 1, 3, 18, 22, 29) | "a numerical characteristic [numerical characteristics] ~~that~~ | "a numerical characteristic [numerical characteristics]" |



LGE_IPT_0078849

| | | |
|---|---|---|
| | ~~may take on a range of values~~" | |

25. I agree with Samsung's proposed construction of "histogram." A POSA would agree, as do both parties, that a histogram is a "statistical representation" showing the frequency of occurrence of values of a parameter. But a histogram is not as broad as IPT asserts. Because IPT disagrees that a histogram is formed dividing a parameter's range of values into defined intervals and counting how often the value of that parameter falls within each defined interval, it is evident that IPT believes a standard bar chart, comparing different categories, would also be a histogram.

26. A POSA's understanding of the term "histogram" is reflected in dictionaries and statistics textbooks of the time of the alleged invention. For example, a histogram is commonly defined as "a graph of a frequency distribution in which rectangles with bases on the horizontal axis are given widths equal to the ***class intervals*** and heights equal to the corresponding frequency." Ex. 1, Random House Dict. (1997), at 907 (emphasis added).




27. To form a histogram:

> Divide the ***range*** of the measurements (the difference between the largest and smallest measurements) by the appropriate number of class intervals desired. . . . To construct a frequency histogram draw two axes: a horizontal axis labeled with the class intervals and a vertical axis labeled with the frequencies. Then construct a rectangle over each class interval with a height equal to the number of measurements falling within a given subinterval.

Ex. 1, An Intro to Statistical Methods and Data Analysis (1984) at 12-13 (emphasis original). Histograms have defined intervals of the range of values of the parameter because unlike common bar charts, histograms compare data that can take on a range of values. In other words,

histograms are made of data that are quantitative, as opposed to data that are qualitative or categorical. Statistics textbooks of the time reflect how a POSA would have understood this:

> First, the distinction between bar charts and histograms is based on the distinction between qualitative and quantitative variables. Values of qualitative variables vary in kind but not degree and hence are not measurements. For example, the variable political party affiliation can be categorized as Republican, Democrat, or other, and, although we could label the categories as one, two, or three, these values are only codes and have no quantitative interpretation. In contrast, quantitative variables have actual units of measure. . . . Bar charts are used to display frequency data from qualitative variables; histograms are appropriate for displaying frequency data for quantitative variables.

Ex. 2, An Intro to Statistical Methods and Data Analysis (1984) at 13-14 (emphasis original).

28. The asserted patents' descriptions of histograms are consistent with Samsung's construction and with the understanding of a POSA. In every case, the range of values of the parameter is divided into defined intervals to generate the histogram. For example, a histogram of values of "parameter A" is formed by dividing the possible values of A into n intervals:

> Analysis memory 100 includes a number, n, of addresses, d, ***equal to the number of possible levels for the values of the parameter A*** that must be discriminated.

'293 Patent at 8:47-50. All of the other patents similarly disclose dividing the range of possible values of a given parameter into defined intervals to create histograms. '445 Patent at 16:66-17:41;[1] '518 Patent at 14:37-15:10.

29. I disagree with Dr. Agouris's statement that histogram intervals are not "defined" but are instead variable and not fixed. Dkt. 133-17 ¶ 35. The number of bits used to address a histogram memory can be configured at the outset to different values, depending on the properties of the parameter to be histogrammed. In fact, this is exactly what creating "defined intervals" means. But Dr. Agouris implies that the interval size is adjusted in real time while a histogram is being calculated, which cannot be the case. If the interval definitions were changed

[1] The specification of the '134, '001, '015, and '445 patents are nearly identical. In this declaration, my citation to one of these specifications should be taken to be a citation to the corresponding portion of the others, as well.

in the middle of a frame while a histogram was being calculated, the result would not be a statistical distribution of values of the parameter. The operation of sorting pixel values into defined intervals would fail if the size of the intervals were changed partway through processing an image. Any "real time" updating of interval definitions could only occur between instances of histogram formation (*i.e.*, between frames), not during histogram formation. Thus, for any given histogram, the bins of the histogram are "defined intervals," as Samsung's construction and the patent specifications require.

**B. The "coincidence" terms ('293, Claims 1, 3, 18, 22, 29)**

| Claim Term | Samsung's Construction | IPT's Construction |
|---|---|---|
| "wherein the validation signal is produced from time coincidences signals from the time coincidence bus so that the calculation of the histogram depends on the classification signals carried by the time coincidence bus" (claim 1) | "wherein the validation signal is produced when two or more classification signals satisfy stored conditions at the same time" | plain meaning |
| "coincidence unit" (claims 18, 22) / "time coincidences unit" (claim 3) | "a unit that generates an enable signal when the outputs of two or more classification units satisfy stored conditions at the same time" | plain meaning |
| "enabling the calculating step when classified data satisfies predetermined time coincidence criteria" (claim 29) | "enabling the calculating step when the classified data satisfies two or more stored conditions at the same time" | plain meaning |

30. I agree with Samsung's constructions of these terms. A POSA would have understood that "coincidence" means happening at the same time and that a "coincidence unit" with an input from only one classifier would effectively do nothing.

31. A POSA reading these claims would note that plural terms are used to describe the signals and coincidence criteria evaluated by the coincidence unit: '293 Patent claim 1 ("depends on the ***classification signals*** carried by the time coincidence bus"); claim 3 ("time



LGE_IPT_0078852

Case 2:16-cv-00305-JRG Document 188-7 Filed 04/28/17 Page 11 of 32 PageID #: 2824

coincidences unit outputs a positive global enabling signal when ***all the individual time coincidences signals*** are positive"); claims 18 and 22 ("coincidence unit coupled . . . to receive selected ***coincidence criteria***"); claim 29 ("when classified data satisfies predetermined ***time coincidence criteria***."). This supports Samsung's construction requiring two or more classification signals, as do all of the embodiments described in the specification.

32. I disagree with Dr. Agouris's statement that Samsung's inclusion of the language "at the same time" is incorrect or misleading, given that computer systems might process events sequentially or in close proximity and not precisely at the same time. Dkt. 133-17 ¶ 43. In the context of the specification, it is clear that the validation signal generated by the coincidences unit is used to decide whether or not a given pixel is included in the histogram being calculated. Thus, a POSA would understand that "at the same time" means that all of the relevant conditions are evaluated together at the time the decision is made to include or not include that pixel in the histogram. Whether this happens at precisely the same instant or in close proximity is irrelevant, as long as all conditions are evaluated for the pixel currently being analyzed.

33. I also disagree with Dr. Agouris's statement that "predetermined time coincidence criteria" are not "stored conditions." Dkt. 133-17 ¶ 43. The patent states "the time coincidences block is a memory that may contain several values forming together the time coincidences criterion R. . . . Each of these values is stored in memory . . . ." '293 Patent at 16:60-65. Moreover, "predetermined" criteria are necessarily "stored," at least until they are compared to the classified data.

**C. The "automatic classification" terms ('293, Claims 18, 29)**

| Claim Term | Samsung's Construction | IPT's Construction |
|---|---|---|
| "wherein classification is performed automatically by processing statistical | "wherein classification is performed using criteria that are updated without human | "wherein classification for the histogram being calculated is performed using criteria that |



LGE_IPT_0078853

| | | |
|---|---|---|
| information associated with the calculated histogram" (claim 18) | intervention after the histogram has been calculated using data characterizing the distribution of parameter values contained in the calculated histogram" | are updated, as the histogram is being calculated, using data characterizing the distribution of parameter values contained in the histogram." |
| "automatically updating, for each instant of time, the classification criteria stored in the classification memory based on statistical information associated with the histogram" (claim 29) | "for each given instant of time, updating classification criteria stored in memory without human intervention using data characterizing the distribution of parameter values contained in the histogram calculated for that instant of time" | Plain meaning // need not be construed by the Court<br><br>Each instant of time refers to each given instant of time |

34. I agree with Samsung's constructions of these terms. I understand that the primary dispute is whether a limitation that criteria are updated "as the histogram is being calculated" should be read into claim 18, as IPT proposes.

35. A POSA reading these claims in view of the specification would not agree that classification criteria are updated during the calculation of a histogram. Claim 18 recites "classification is performed automatically by processing statistical information associated with the ***calculated*** histogram"—not the "histogram being calculated," or the "partially formed histogram." Claim 19, which depends from claim 18, adds a classifier memory table and recites "updating the selection criteria in the memory table based on the ***processed*** statistical information"—not the "partially complete statistical information" or "statistical information being collected." A POSA would understand that the past tense of "calculated" and "processed" indicates that the histogram is calculated and the statistical data is processed before the automatic classification is performed.

36. In addition, the specification states: "[g]enerally, the classifier may be achieved according to numerous embodiments, the essential being that it allows to place the parameter DATA(A) with respect to values or limits ***statistically determined over a set of former data***

DATA(A)." *Id.* 13:32-36. A POSA would understand this to mean that statistical data regarding the prior histogram is used to updated the classification criteria use to generate the next histogram.

37. I disagree with Dr. Agouris's opinion that the specification's reference to "real time updating of the classifier" means that the classifier memory is updated while a histogram is being calculated. Dkt. 133-17 ¶ 77. To the contrary, the specification describes the timing of the "real time updating of the classifier," and it happens only at the ***end*** of a frame, not ***during*** a frame. A frame is histogrammed between the INIT and END signals:

> The operation of the histogram calculation unit is controlled by signals represented on FIG. 5, i.e. an initialisation signal (INIT), a writing signal (WRITE), that carry the information corresponding to each pixel in the frame (or the image) and an end signal END.




**FIG. 5**

*Id.* at 18:18-23; Fig. 5 (annotated). The "real time updating of the classifier" happens at the "END" signal, *i.e.*, after the histogram and the statistical data have been calculated:

> In this embodiment, the content of the memory of the classifier 101 is automatically updated. . . . To fulfil the self-adapting function, i.e. ***real time updating of the classifier*** 101, the histogram calculation unit 1 of FIG. 3 is perfected in accordance with FIG. 4. Instead of having a simple register 101r written outside the system, the classifier 101 has an addressable memory whose ***writing is controlled by a signal END***. The sequencer 9 generates this signal END represented in FIG. 5.

'293 Patent at 11:15-25. Thus, the classifier memory is only updated when the "END" signal goes high, signifying the end of a frame, when the histogram is complete. The classifier memory

is not updated during a frame while the histogram is being calculated.

38. Regarding Claim 29, I agree with Dr. Agouris that "[i]n light of the specification, a POSA would recognize that a 'given instant of time' refers to a frame of pixels." Dkt. 133-17 ¶ 85. Thus, the automatic updating of the classifier is performed on a frame-by-frame basis and not while the histogram is being calculated. For the reasons discussed above, the classifier memory is updated between frames and not during the calculation of a histogram.

39. I disagree with Dr. Agouris that the phrase "without human intervention," which Samsung uses in its constructions to explain "automatic" is unnecessary or has no basis. Dkt. 133-17 ¶¶ 77, 86. A POSA would know that automatic generally means without human intervention or without external intervention. Ex. 4, Webster's New College Dict. (2001) at 76 (defining automatic as "operating in a matter essentially independent of external influence or control"). Adding this phrase is necessary and helpful because IPT completely ignores the word "automatically" and attempts to read it out of the claims.

**D. "learning multiplexer" ('293, Claim 3)**

| Samsung's Construction | IPT's Construction |
|---|---|
| "logic for switching between a learning mode and a processing mode" | "multiplexer that selectively allows updating of histogram calculation unit registers based on statistical processing of the data aijT" |

40. I agree with Samsung's construction of "learning multiplexer." The term "multiplexer" would have been familiar to a POSA as a logic switch that selects one of multiple states or modes. Ex. 5, IEEE Standard Dict. of Elec. Eng. Terms (1996) (multiplexer: "a device for selecting one of a number of inputs and switching its information to the output"). The specification describes the learning multiplexer as follows: "The learning multiplexer 109 selects either of both possible operating modes (processing and learning)." '293 Patent at 17:58-60.

Thus, a POSA would understand this term to mean "logic for switching between a learning mode and a processing mode."

41. IPT's construction is not focused on explaining what a "learning multiplexer" is. Rather, it focuses on what the system does after being switched to a learning mode. But the claim already recites what happens in the learning mode, and it is different from what IPT states in its construction. A POSA would not need functional language describing what a learning mode does to understand the term "learning multiplexer," especially when what the learning mode actually does is already recited elsewhere in the claim.

42. I disagree with Dr. Agouris that Samsung is trying to import a limitation into the claim by referring to a "processing mode." Dkt. 133-17 ¶ 48. A POSA would understand that "multiplexer" switches between multiple states. One of those states is the learning mode. The other is disclosed in the specification to be the "processing mode." A POSA would understand there must be at least two states to choose from by virtue of the term "multiplexer."

**E. "configured to determine the data in the histogram that satisfy a selected criterion" ('293, Claims 18, 22)**

| Samsung's Construction | IPT's Construction |
|---|---|
| Indefinite<br><br>Alternatively, plain meaning | "configured to determine the data to be included in the histogram based on satisfying a selected criterion" |

43. I agree with Samsung that this term is indefinite, or in the alternative, that "in the histogram" means that data is in the histogram and not that the data will be in the histogram at some future time, as IPT's construction reads.

44. In the context of claims 18 and 22 taken as a whole, a POSA would not be able to determine the meaning of this term or the scope of the claims. Both claims 18 and 22 recite that a coincidence unit "generate[s] an ***enable*** signal for the histogram unit when the ***output*** of the

classification unit satisfies the selected coincidence criterion." '293 Patent at claims 18, 22. Data is only added to the histogram when the histogram unit is enabled. But the classification unit is "configured to determine the data ***in the histogram*** that satisfy a selected criterion, and to ***generate an output*** accordingly." *Id.* And there can be no data in the histogram until the output of the classification unit is evaluated by the coincidence unit. This creates a circular logic problem, and a POSA would not reasonably be able to determine the scope of what is recited in claims 18 and 22.

45. I disagree with IPT that the claim should be rewritten to fix this problem by changing "data in the histogram" to "data to be included in the histogram." A POSA would understand "data in the histogram" to mean that the data is currently in the histogram, not that it will be included in the histogram at a future time.

**F. Indefinite terms of '293, Claim 3**

46. I agree with Samsung that at least the seven terms below from claim 3 are indefinite.

| **Claim Term ('293, Claim 3)** | **Samsung's Construction** | **IPT's Construction** |
|---|---|---|
| "values typical of a sequence of each of these registers" | indefinite | plain meaning // need not be construed by the Court |
| "the data DATA(A), DATA(B), . . ., DATA(E)" | Indefinite<br><br>alternatively:<br>"values of five different parameters DATA(A), DATA(B), DATA(C), DATA(D), and DATA(E)" | plain meaning // need not be construed by the Court |
| "the parameter DATA(A)" / "parameters other than DATA(A)" | Indefinite | plain meaning // need not be construed by the Court |
| "the single time coincidence bus" | Indefinite | plain meaning // need not be construed by the Court |
| "all the individual time coincidence | Indefinite | plain meaning // need not |

| | | |
|---|---|---|
| signals" | | be construed by the Court |
| "wherein a counter of each address in the memory corresponds to the value d of aijT at a given instant" | Indefinite | plain meaning // need not be construed by the Court |
| "wherein the test unit is provided for calculating and storing statistical data processes, after receiving the data aijT corresponding to the space at an instant T, a content of the analysis memory in order to update the output memory of the analysis output unit" | Indefinite | plain meaning // need not be construed by the Court |

1. **"values typical of a sequence of each of these registers"**

47. "Typical" is a vague term of degree, and a POSA reading the claim in light of the specification would receive no guidance for determining what is a "typical" value for any register or what is meant by a "sequence of each of these registers." The only place the specification uses the word "typical" is in a sentence of the "Summary" section that parrots this claim language and does not explain what it means. '293 Patent at 3:20-22. A POSA would not reasonably be able to determine which values of the claimed registers would be typical, as opposed to atypical, and therefore, to determine the scope of this claim. Dr. Agouris states that "typical" means "representative or commonly used in the context of claim 3." Dkt. 133-17 ¶ 21. But this does not resolve the problem because a POSA reading the claim and specification would receive no guidance as to what values would be "representative or commonly used in the context of claim 3."

2. **"the data DATA(A), DATA(B), . . . , DATA(E)"**

48. This term lacks antecedent basis, making it unclear to a POSA what "data" are received by the "two or more histogram calculation units." The claim later recites "the parameter DATA(A)," and "digital signal DATA(A)," which may or may not refer to "the data DATA(A)." It is also unclear whether the two or more histogram units each receives data

DATA(A), all data DATA(A) through DATA(E), or something else. Thus, a POSA cannot determine what must be received by a system in order to fall within the claim's scope.

49. Alternatively, the specification shows five data inputs—DATA(A), DATA(B), DATA(C), DATA(D), and DATA(E)—to histogram units in Figure 30. If this phrase is not indefinite, it should be construed to mean "values of five different parameters DATA(A), DATA(B), DATA(C), DATA(D), and DATA(E)."

50. I disagree with Dr. Agouris that Samsung's alternative construction excludes a disclosed embodiment with histogram units that receive more than five input data signals. Dkt. 133-17 ¶ 53. Any embodiment with five ***or more*** input data signals would meet this limitation.

3. **"the parameter DATA(A)" and "parameters other than DATA(A)"**

51. "The parameter DATA(A)" lacks antecedent basis, as claim 3 variously recites "data DATA(A)," "digital signal DATA(A)," and "the signal DATA(A)" before referring to "the parameter DATA(A)." A POSA would not be able to determine which of these, if any, "the parameter DATA(A)" refers to. Similarly, it would be unclear to a POSA which parameters would be "parameters other than DATA(A)" because "the parameter DATA(A)" is the only parameter mentioned in claim 3.

4. **"the single time coincidence bus"**

52. This term lacks antecedent basis. It would be unclear to a POSA whether "the single time coincidence bus" refers back to "a time coincidences bus" or to a different singular structure.

5. **"all the individual time coincidence signals"**

53. This term lacks antecedent basis. Claim 3 recites that the "time coincidences unit" outputs a "positive global enabling signal when all the individual time coincidences signals are positive." Claim 3 also recites that the time coincidence unit "receives the ***output signal***

***from the classifier unit*** and, from outside the histogram calculation unit, ***individual binary enabling signals*** affecting parameters other than DATA(A)." Further, claim 3 recites that the "two or more histogram calculation units . . . supply ***classification information*** to the single time coincidences bus." None of these signals are referred to as "individual time coincidences signals," and it would be unclear to a POSA whether that phrase refers to all of these signals, a subset of these signals, or something else entirely. Thus, it is impossible for a POSA to determine the scope of this claim.

**6. "wherein a counter of each address in the memory corresponds to the value d of aijT at a given instant"**

54. A POSA would not be able to understand this phrase for two reasons. First, "the memory" is ambiguous because claim 3 recites at least three different memories: "an analysis memory," "a classifier unit comprising a memory," and "an analysis output unit including output memory." It is not possible for one of ordinary skill to determine which of these memories is referred to by the phrase "counter of each address in the memory."

55. I disagree with Dr. Agouris that the analysis memory is the only memory in claim 3 that is addressable. Dkt. 133-17 ¶ 63. Claim 4, which depends from claim 3, recites that the "memory of the classifier is an addressable memory," which necessarily requires that classifier memory of claim 3 may also be addressable.

56. Second, "corresponds to the value d of $a_{ijT}$ at a given instant" is ambiguous because "the value d of $a_{ijT}$" has no antecedent basis. It is not clear if d refers to the value of a particular digitized sample of DATA(A) at time T and spatial position (i,j), a value in a histogram memory, a digitized sample of DATA(D), or some other value. A POSA would not be able to determine the meaning of this phrase.



LGE_IPT_0078861

57. I disagree with Dr. Agouris that this phrase refers to "a parameter value at a given instant." Dkt. 133-17 ¶ 63. Claim 3 recites "a counter of each address in the memory corresponds to the value d of $a_{ijT}$ at a given instant, which is incremented by one unit . . . ." A "parameter value at a given instant" is never used as a counter that is incremented. Even IPT is unable to interpret the meaning of this term.

7. **"wherein the test unit is provided for calculating and storing statistical data processes, after receiving the data aijT corresponding to the space at an instant T, a content of the analysis memory in order to update the output memory of the analysis output unit"**

58. A POSA would not be able to understand the phrase "a content of the analysis memory in order to update the output memory of the analysis output unit." This phrase is not grammatically correct and at least appears to be missing a verb, rendering it meaningless.

59. I disagree with Dr. Agouris's statement that the overall term means that the "test unit" receives "'data $a_{ijT}$' from 'the content of the analysis memory'." Dkt. 133-17 ¶ 66. Figure 3 and 4 disclose that data $a_{ijT}$ (DATA(A)) is used to ***address*** the analysis memory but is not ***stored*** in it and, therefore, could not be part of the "content of the analysis memory." Even IPT cannot interpret this term.

**G. "domain" and "class" ('001, Claims 1, 8; '015, Claim 6; '134, Claim 1)**

| Claim Term | Samsung's Construction | IPT's Construction |
|---|---|---|
| "domain" ('001, Claims 1, 8; '015, Claim 6; '134, Claim 1) | "the ~~set of all possible~~ complete set of values for a property of a pixel" | "the complete set of values for a parameter" |
| "class" ('001, Claims 1, 8; '015, Claim 6; '134, Claim 1) | "a range of values in a 'domain'" | "a selected subset of values of a parameter" |

60. I agree with Samsung's constructions of "domain" and "class." A POSA reading the claims would understand that the claims all use the terms "domain" and "class" in the context of pixels. '134 Patent claim 1 and '001 Patent claims 1, 8 ("histogram of the ***pixels*** in the one or

more of a plurality of ***classes*** in the one or more of a plurality of ***domains***"); '015 Patent claim 6 ("target comprising ***pixels*** in one or more of a plurality of ***classes*** in one or more of a plurality of ***domains***").

61. Every domain discussed in the patents is a property of a pixel. For example, "domains include luminance, hue, saturation, speed (V), oriented direction (DI), time constant (CO), first axis (x(m)), and second axis (y(m))." '134 Patent at Abstract. Histograms are then formed of the pixels in a selected domain by using a memory with enough addresses to account for every value in the domain and enough bits to account for all pixels in a frame. For example:

> Histogram formation block 25 receives speed signal V and enables a histogram to be formed for the various speeds present in a frame. In a preferred embodiment, the speed is an integer in the range 0-7. Histogram formation block 25 is then preferably a memory addressable with 3 bits, with each memory location having a sufficient number of bits to correspond to the number of pixels in a frame.

'134 Patent at 17:4-10. The three address bits specify eight memory locations for a histogram in the speed domain, corresponding to the complete set of values (0-7) of the speed (V) property of each pixel. Thus, a domain is the complete set of values for a particular property of a pixel.

62. A domain is divided into "classes," with each class representing a defined range of values within a domain. The specification presents an example of classes in a velocity domain:

> FIG. 14a shows an example of the successive classes C1 C2 . . . Cn−1 Cn, each representing a particular velocity, for a hypothetical velocity histogram, with their being categorization for up to 16 velocities (15 are shown) in this example.




FIG. 14a

*Id.* at 20:49-53; Fig. 14a. Thus, a "class" is a range of values within a domain.

63. A POSA would understand that in the context of histograms, a "class" is a range of values within a domain. The introductory book, "Teach Yourself Statistics" (1994) describes "class" in these terms:

> The histogram in Figure 3.9 shows the proportions of babies born to mothers at different ages of mother.




**Fig. 3.9** Histogram showing the number of live births in Great Britain by age of mother, 1989
Source: *Social Trends 21*, page 42, Figure 2.19

> A key distinction between the histogram and the bar chart described earlier is that here the adjacent bars are made to touch. The reason for this is to emphasise the fact that the horizontal axis on a histogram represents a continuous number scale. It is important to be aware that the bars on a histogram do not represent separate categories, as they do on a bar chart, but, rather, adjacent intervals on a number line. In other words, although superficially the bar chart and the histogram look similar, they are designed to represent two quite different types of data. The bar chart is useful for depicting separate *categories*, while the histogram describes the 'shape' of data that have been *measured on a continuous number scale*. This distinction between these two types of data is an important one and will be returned to in the next chapter. In the example above, the data have been grouped into intervals of five years on the horizontal axis. This is known as the *class interval*, and in Figure 3.9 the class intervals are all equal.

Ex 3, Teach Yourself Statistics at 37 ("In the example above, the data have been grouped into intervals of five years on the horizontal axis. This is known as the *class interval* . . . .").

64. I disagree with Dr. Agouris that a "class" is not a range of values" but could be non-contiguous "selected" values from a domain. Dkt. 133-17 ¶ 91. For example, she cites the '134 Patent, which states "***classifier*** 25b may be set to consider only data within a particular speed ***category*** or ***categories***, e.g., speed 1, speeds 3 or 5, speed 3-6, etc." '134 Patent at 18:15-17. But a POSA would understand that this is describing how a ***classifier*** unit may be programmed with selection criteria that select pixels in one or more classes (e.g., "particular speed category or categories"). In other words, the classifier unit selects pixels from one or more classes. But the classes themselves are ranges of values in the domain, as Figure 14a shows.

**H. "forming at least one histogram of the pixels in the one or more of a plurality of classes in the one or more of a plurality of domains" ('001, Claims 1, 8; '015, Claim 6; '134, Claim 1)**

| Samsung's Construction | IPT's Construction |
|---|---|
| "forming at least one 'histogram' of the pixels in at least one 'class' selected from multiple 'classes' in at least one of multiple 'domains'" | "forming at least one histogram of the pixels in two or more classes that are in two or more domains" |

65. I agree with Samsung's constructions of this term. A POSA would understand that "one or more objects" refers to either one object or more than one object—or in other words, at least one object. There is no justification for rewriting this phrase, as IPT proposes, to mean at least two.

66. A POSA would understand that "plurality" means multiple (more than one). Thus, "pixels in the one or more of ***a plurality*** of classes" refers to pixels in at least one class of ***multiple*** classes. Likewise "one or more of a plurality of domains" refers to at least one of ***multiple*** domains.

67. I disagree with Dr. Agouris's interpretation of this term. Dkt. 133-17 ¶ 92. By interpreting this term to refer to "two or more classes" and "two or more domains," she appears to believe the claim recites "pixels in the one or more ***pluralities*** of classes" and that there are,

therefore, multiple sets of classes, each set comprising at least two classes. But this is not how the claim is written.

68. In addition, the specification discloses "classifier 25b may be set to consider only data within a particular speed ***category*** or ***categories***, e.g., speed 1, speeds 3 or 5, speed 3-6, etc." '134 Patent at 18:15-17. In other words, the classifier can consider pixels in just one class ("speed category") as well as in more than one class ("categories"), so Samsung's construction of "one or more of a plurality of classes in the one or more of a plurality of domains" is consistent with how a POSA would understand this term in light of the specification.

**I. "said at least one histogram referring to classes defining said target" ('001, Claims 1, 8; '015, Claim 6; '134, Claim 1)**

| Samsung's Construction | IPT's Construction |
|---|---|
| "the at least one 'histogram' includes data values for pixels meeting classification criteria matching characteristics of the target" | "at least one histogram being formed of pixels in at least two classes that define said target" |

69. I agree with Samsung's construction of this term. A POSA would not readily understand the phrase "referring to classes defining said target" and would need to look to the specification for guidance.

70. The specifications of the '001, '015, and '134 Patents never use or explain the phrases "referring to classes" or "defining" a target. However, they disclose that an "object in an image" may be tracked "based upon its characteristics." '134 Patent at 25:22-23.

> For example, assuming it is desired to track a target moving only to the right in the image. The histogram formation units are set up so that the only validation units set to "1" are for direction and for the x and y projections. The classification unit for direction is set so that only direction "right" is set to "1".

*Id.* at 25:23-28. Thus, the target's characteristic is that it is moving to the right. Pixels meeting the classification condition that direction is equal to "right" are therefore included in the histogram. Thus, as Samsung's construction states, the histogram includes data values for pixels

meeting classification criteria (i.e., direction = "right") matching characteristics of the target (i.e., that it is moving to the right).

71. I disagree with Dr. Agouris's addition of the limitation requiring a "histogram being formed of pixels ***in at least two classes*** that define said target." Dkt 133-17 ¶ 94. This would exclude the primary embodiment discussed above, in which pixels meeting the single condition that their direction is to the right are formed into a histogram.

**J. The "generating a histogram" terms ('445, Claims 1, 9, 14, 24)**

| Claim Term | Samsung's Construction | IPT's Construction |
|---|---|---|
| "generat[e/ing] [a/the] histogram based on classification values of [a/the] plurality of pixels" ('445, Claims 1, 9, 14, 24) | "generat[e/ing] a 'histogram' of two or more pixels that have specified 'classification values'" | "generating a histogram for two or more pixels that ~~each~~ meet two or more selected classification criteria" |
| "generating multiple histograms based on classification values of multiple pluralities of pixels" ('445, Claim 9) | "generating multiple 'histograms,' each of two or more pixels that have specified 'classification values'" | "generating multiple histograms, each for two or more pixels that ~~each~~ meet two or more selected classification criteria" |

72. I agree with Samsung's constructions of these terms. I understand that the parties have agreed that "classification value" means "a value resulting from determining whether a pixel meets a selected classification criteria for a domain." In other words, it is the output of the classification unit.

73. A POSA reading the claims would understand that the histogram is based on "classification values," i.e., the ***output*** of the classifier. IPT rewrites the claim in terms of classification criteria, which are ***inputs*** to the classifier, and then relies on "values" being plural to deduce that there must be multiple classification criteria ***input*** to the classifier. I disagree.

74. The classifier "enables only data having selected classification criteria to be considered further, meaning to possibly be included in the histograms . . . ." '445 Patent at

18:14-16. For example, "[b]y setting a register to '1', e.g., register number 2, only data that meets the criteria of the selected class, e.g. speed 2, will result in a classification output of '1'." *Id.* at 18:24-27. Thus, the "plurality of pixels" processed by a classifier will have "classification values" of 0's and 1's, reflecting the output of the classifier. A histogram is then generated, as the claim recites, based on these classification values of the plurality of pixels. Nowhere does the claim language require that each pixel "meet ***two or more*** selected classification criteria," as IPT's construction states. Only Samsung's constructions are consistent with the claim language and supported by the specification.

### K. The "identifying the target" terms ('001, Claim 1; '015, Claim 6; '134, Claim 1; '445, Claims 1, 24)

| Claim Term | Samsung's Construction | IPT's Construction |
|---|---|---|
| "identifying the target in said at least one histogram itself" ('001, Claim 1; '134, Claim 1) | "identifying pixels in the 'histogram' meeting classification criteria of the target" | Plain meaning // need not be construed by the Court |
| "identify[ing] [a/the] target from the [said at least one] histogram" ('445, Claims 1, 24; '015, Claim 6) | "identify[ing] pixels in the histogram meeting classification criteria of [a/the] target" | Plain meaning // need not be construed by the Court |
| "identifying multiple targets associated with the multiple histograms" ('445, Claim 9) | "identifying pixels in the multiple histograms meeting classification criteria of multiple targets" | Plain meaning // need not be construed by the Court |

75. I agree with Samsung's constructions for these terms. The claims recite that the target is identified "from the histogram" or is identified "in said at least one histogram itself." A POSA would understand this means that a histogram is formed, and those pixels in the histogram that comprise the target are identified. Thus, the target is found from or in the histogram itself. The specification describes the identification process. For example, "[a]ssuming that it were desired to identify an object with a speed of '2' and a direction of '4'", '445 Patent at 21:51-53, the specification states:

> Using the information in the histogram, and especially POSRMAX, the object with the greatest number of pixels at the selected speed and direction could be identified on the video image in real-time.

*Id.* at 21:62-65. POSRMAX, as described in the specification, is "the position [] of the maximum of the histogram . . ." *Id.* at 19:48-49. Thus, by examining the maximum of the histogram formed of pixels meeting the selected classification criteria (such as speed 2 and direction 4), the target can be identified "from the histogram" or "in the histogram itself."

76. The prosecution history also supports this understanding of the terms. In response to a rejection over a patent to Hunke, the applicant argued Hunke identifies a target by creating a "normalized binary image" in which "colors that are not associated with a target, i.e., colors normalized to '0', are removed." Dkt. 133-8, at Amendment dated August 23, 2011. In other words, Hunke created a "normalized binary image" that included only pixels having the target color, rather than forming a histogram and then identifying which pixels in the histogram comprise the target. The applicant stated: "Applicant has clarified the above-described arguments by amending the claims to recite "identifying the target from said at least one histogram <u>itself</u> . . .'" *Id.*

**L. "wherein forming the at least one histogram further comprises determining X minima and maxima and Y minima and maxima of boundaries of the target" ('134, Claim 1)**

| <u>Samsung's Construction</u> | <u>IPT's Construction</u> |
|---|---|
| "wherein forming the at least one 'histogram' includes determining the minimum and maximum x and y coordinates of the target from the minima and maxima of 'histograms' of x and y coordinates of the target" | "wherein forming the at least one histogram further includes forming the histogram based on determined X minima and maxima and Y minima and maxima of boundaries of the target" |

77. I agree with Samsung's constructions for these terms. A POSA reading this claim in light of the specification would understand that the patent describes only one way of determining the X and Y coordinates of the target boundaries:

> In order to ***locate the position*** of an object having user specified criteria within the image, histogram blocks 28 and 29 are used to ***generate histograms for the x and y positions of pixels with the selected criteria***. These are shown in FIG. 12 as histograms along the x and y coordinates.

'134 Patent at 20:55-59.




FIG. 12

> In addition, since it is desired to locate the object (s) with this speed and direction on the video image, the validation signals for histogram formation blocks 28 and 29, which correspond to the x and y coordinates, would be set to "1" as well. In this way, ***histogram formation blocks 28 and 29 would form histograms of only the pixels with the selected speed and direction***, in real-time.

*Id.* at 21:53-60.

78. I disagree with Dr. Agouris that "determining X minima and maxima and Y minima and maxima of boundaries of the target" is done "by setting the XMIN and XMAX, and YMIN and YMAX values as desired." Dkt. 133-17 ¶ 102. A POSA would understand that process is backwards. The claim recites "determining" the X and Y boundaries, while IPT discusses a process that can be performed once the XMIN, XMAX, YMIN, and YMAX have ***already been determined***. Indeed, a POSA would not interpret "determining X minima and maxima" to mean "determined X minima and maxima," as IPT proposes in its construction.

**M. "displaying an outline associated with the target" ('445, Claims 4, 9, 25)**

| **Samsung's Construction** | **IPT's Construction** |
| --- | --- |
| plain meaning | "displaying an outline that overlaps a boundary of the target" |

79. I agree with Samsung that this term should be interpreted according to its plain meaning. A POSA would understand that the outline must simply define and bound the target, as the plain meaning of this phrase and the patent specification demand. The outline does not have to overlap a boundary of the target.

80. The '445 Patent specification never describes an "outline." Dr. Agouris alleges the "targeting box" is synonymous with the claimed outline. Dkt. 133-17 ¶ 106. Even if this were the case, the targeting box is not constrained to overlap a boundary of the target. Rather, "as the target moves, the targeting box will move with the target, constantly adjusting the center of the targeting box based upon the movement of the target, ***and enlarging and reducing the size of the targeting box***." '445 Patent at 25:16-69. Sometimes it is advantageous for tracking purposes that the tracking box remain larger than the boundaries of the target (i.e., not overlapping them):

> It will be appreciated that in the course of tracking a target, the ***tracking box will be enlarged and reduced as appropriate to maintain a track of the target***, and is preferably adjusted on a frame by-frame basis.

*Id.* at 25:1-4. Thus, IPT's construction would exclude the only embodiment the patent discloses.

81. A POSA would interpret this term to be consistent with plain meaning of outline as "the line by which a figure or object is defined or bounded." Ex. 1, Random House Dict. (1997) at 1375. Thus "displaying an outline associated with the target" should be construed according to its plain meaning in light of the specification, which would be displaying a contour that defines or bounds the target.

### N. Indefinite terms lacking antecedent basis ('445, Claims 26, 27; '001, Claims 7, 8; '134, Claim 4)

| Claim Term | Samsung's Construction | IPT's Construction |
|---|---|---|
| "move a center point of the outline" ('445, Claim 27) | indefinite | "calculate new x and y coordinates of the center |

| | | |
|---|---|---|
| | | point of the outline” |
| “adjust a size of the outline based on the histogram based on the first frame and the histogram based on the second frame”(’445, Claim 26) | indefinite | Plain meaning // need not be construed by the Court |
| “successively increasing the size of a selected area until the boundary of the target is found” (’001, Claims 7 & 8; ’134, Claim 4) | indefinite | Plain meaning // need not be construed by the Court |

82. I agree with Samsung that these terms are indefinite because they do not permit a POSA to reasonably determine the scope of the claim. Each of these terms lacks antecedent basis.

83. Claims 26 and 27 of the ’445 patent both depend from claim 24 and recite adjusting or moving “the outline.” However, claim 24 nowhere mentions an outline. The “outline” is added by claim 25, which depends from claim 24. ’445 Patent at 28:30-33. But neither claim 26 nor 27 depends from claim 25; instead, each depends directly from claim 24. Thus, a POSA would not have been able to determine the scope of these claims.

84. Claim 4 of the ’134 Patent and claims 7 and 8 of the ’001 patent recite “successively increasing the size of a selected area until the boundary of the target is found.” But “the boundary of the target” lacks antecedent basis for each of these claims. Claim 1 of the ’134 patent, from which claim 4 depends, recites “determining X minima and maxima and Y minima and maxima of ***boundaries*** of the target.” Thus, the target has four boundaries—min and max X boundaries and min and max Y boundaries. A POSA would not be able to determine which of these four boundaries is referred to by the phrase “the boundary” in claim 4 and by how much the “selected area” must be increased in order to infringe this claim.

85. For claims 7 and 8 of the ’001 patent, there is simply no antecedent basis at all for “the boundary.” To the extent that $X_{MIN}$, $X_{MAX}$, $Y_{MIN}$, $Y_{MAX}$ values described in the specification define four “boundaries” of a target, a POSA would still be unable to determine which of these

four boundaries is the recited "boundary" that must be found by increasing the size of the selected area, or if all four boundaries must be found.

**O. "anthropomorphic model" ('518, Claim 39)**

| Samsung's Construction | IPT's Construction |
|---|---|
| "mathematical ~~or graphical~~ representation specifying the spatial relationship of human facial features" | Plain meaning // need not be construed by the Court |

86. I agree with both Samsung and IPT that the anthropomorphic model refers to the spatial relationship of human facial characteristics. Dkt. 133-17 ¶ 113. A POSA would understand that a "model" in this context refers to a mathematical representation of something. Thus, a POSA would understand the plain meaning of "anthropomorphic model" in light of the specification and claims is "mathematical representation specifying the spatial relationship of human facial features."

**P. "analyzing the at least one histogram over time" ('518, Claim 39)**

| Samsung's Construction | IPT's Construction |
|---|---|
| Plain meaning | "analyzing the at least one histogram as the histogram is computed based on new images" |

87. A POSA would understand that analyzing an object "over time" means analyzing the object during successive instants of time.

88. I disagree with Dr. Agouris's interpretation of this claim. Dkt. 133-17 ¶ 116. IPT's construction focuses on a single instant of time by requiring that the histogram is analyzed "as the histogram is computed." The specification explains that a histogram is computed for a single frame and a single instant of time—the histogram memory is cleared during the blanking interval between frames. '518 Patent at 15:30-47. Thus, all of the pixels in a histogram come from the same frame, and thus, the same instant of time. So if the histogram is analyzed "as the

histogram is computed," as IPT's construction requires, it cannot be analyzing the histogram "over time" as the claim requires.

89. Dr. Agouris states that a POSA would understand that analyzing over time requires "analyzing the at least one histogram as the histogram is computed ***based on new images***." Dkt. 133-17 ¶ 116. I disagree because this phrase has no support in the claim. Claim 39 recites "acquiring ***an image*** of the face of the person," "identifying a portion of ***the image***," and "selecting pixels of the portion of ***the image***." A POSA would not understand the claim to require that "new images" are acquired.

## IV. Conclusion

90. For the reasons discussed above, I agree with Samsung's proposed claim constructions and with its assertions that certain claims are invalid as indefinite.

91. I hereby declare that all statements made herein of my own knowledge are true, and that all statements made on information and belief are believed to be true and that such statements are made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code. This declaration was executed on April 28, 2017 at South Bend, Indiana.



Robert L. Stevenson, Ph.D.